UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

_____

| | |
|---|---|
| **LENORE AEBISCHER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 05-CV-2121 |
| ) | |
| **STRYKER CORPORATION, and** ) | |
| **HOWMEDICA OSTEONICS CORP.,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#111) filed by Defendants Howmedica Osteonics Corporation (Howmedica) and Stryker Corporation (Stryker). Following this court's careful consideration of the arguments of the parties and the documents provided by the parties, this court agrees with Defendants that Plaintiff's claims are time-barred. Accordingly, Defendants' Motion for Summary Judgment (#111) is GRANTED. Therefore, the motions filed by the parties on February 19, 2007 (#167, #169, #170, #172) are MOOT.

## FACTS

Plaintiff, Lenore Aebischer, has worked as a special education teacher since she obtained her bachelor's degree and began teaching. On December 8, 1997, Plaintiff underwent surgery and had a total hip replacement. Plaintiff was 44 years old at that time. Plaintiff had a total hip replacement because of a long history of hip pain, which had become more severe in the preceding two years. X-rays taken prior to the surgery showed severe loss and collapse of the femoral head. The x-rays also showed that Plaintiff had a dysplastic and shallow acetabulum. In other words, Plaintiff had abnormal growth or development of the cup-shaped socket in the hip bone. Having failed to obtain relief with conservative treatment and given her increased pain and marked loss of motion, Plaintiff

decided to proceed with total hip replacement. The components which were implanted during her surgery included an Osteonics metal acetabular shell, a polyethylene liner for the shell, a femoral stem, a Zirconia (ceramic) femoral head and bone screws.

Prior to surgery, Plaintiff and her doctor, Dr. Peter Bonutti, discussed the fact that, because she was having her hip replaced at a relatively young age, she would need at least one revision surgery during her lifetime. Dr. Bonutti testified that he discussed with Plaintiff that, at her age and activity level, she was at an increased risk for loosening and wearing over time. However, Plaintiff testified that Dr. Bonutti told her that the initial implant would last 15 to 20 years. Dr. Bonutti performed the surgery and Plaintiff did very well following the surgery. Plaintiff testified that she returned to work on January 27, 1998, was doing well and was walking without a limp. She testified that she was able to return to her regular daily activities, including exercise.

Plaintiff had a follow-up visit with Dr. Bonutti on February 3, 1998, and then did not return to see him until August 23, 2001. At that time, Plaintiff complained that she had been having groin pain for approximately six months and some discomfort with standing and walking. X-rays taken on that date showed "possible small wear around the socket" and a "possible early lytic problem on the acetabulum." Dr. Bonutti discussed with Plaintiff his concern that she may have osteolysis, which he defined as "dead bone." Dr. Bonutti testified that the most common cause of osteolysis in a total hip replacement is wear of the polyethylene or plastic. He testified that other possible causes are metal debris or metal wear and infection. Dr. Bonutti advised anti-inflammatories and stretching.

On October 5, 2001, Plaintiff had a bone scan performed at Sara Bush Lincoln Health Center. The bone scan showed increased activity over the proximal left femur. The bone scan report stated

that this "may be a site for either infection and/or loosening of the prosthesis." On October 11, 2001, Plaintiff returned to Dr. Bonutti's office still complaining of groin pain. Plaintiff testified that, at that office visit, Dr. Bonutti had concerns about the hip components loosening. On November 13, 2001, Plaintiff saw Dr. Bonutti for follow-up regarding her left hip pain. Dr. Bonutti testified that, at this office visit, he was suspicious about loosening of the components and was concerned that another surgery may be required. Dr. Bonutti stated that he talked to Plaintiff "about changing her activity, lifestyle, unloading her hip, decreasing the wear risks, avoiding any type of impact loading." He testified that he also told her to "stay[] away from any type of sporting-related activities or workouts" and to "[t]ry to slow down, essentially, and see if her symptoms would resolve." On November 26, 2001, Plaintiff saw her chiropractor, Dr. Steven Hutti, and told him that Dr. Bonutti was concerned that the appliance in her left hip may be loose.

On January 8, 2002, Dr. Bonutti saw Plaintiff again in his office. Dr. Bonutti testified that Plaintiff was having increased pain. Dr. Bonutti testified that he made the diagnosis of osteolysis at that time. He stated that he was concerned about the wear and the osteolysis, and was concerned that "the acetabular component would be loosening." Dr. Bonutti testified that he was concerned that Plaintiff "would require revision surgery; that the osteolysis was becoming worse." He testified that he told Plaintiff that she really needed "to seriously think about surgery to correct this." He stated he told her that he thought "surgery was inevitable at this stage, and that she should start planning for that." X-rays taken that day showed that Plaintiff had "cystic lesions with wear of the polyethylene with proximal riding femoral head in the acetabular socket."

Plaintiff testified at her deposition that, on January 8, 2002, her understanding of the osteolysis in her hip was that particles of polyethylene from the Osteonics polyethylene liner had

gotten between her implant and the bone and had progressively worn the bone away causing the implant to loosen. Plaintiff testified that she also knew on that date that, if the osteolysis continued to progress, the implant "would continue to loosen."

On June 11, 2002, Plaintiff returned to see Dr. Bonutti at which time he confirmed by x-ray that the acetabular component was loose. He testified that "at that visit, I would have definitely said the acetabular component was loose." X-rays showed a 3 mm. shift proximally on the acetabular liner and cystic changes around the acetabulum consistent with osteolysis. Dr. Bonutti testified that he let Plaintiff know "that she need[ed] to start thinking about surgical options, or it will get worse rapidly." Dr. Bonutti testified that Plaintiff did not want to have revision surgery at that time.

On December 10, 2002, Plaintiff saw Dr. Bonutti again for follow-up of the polyethylene wear of her hip. Dr. Bonutti advised Plaintiff to undergo surgery to replace the Osteonics polyethylene liner because the x-ray showed her osteolysis was getting worse. Dr. Bonutti testified that he was concerned about the acetabulum and "told her she should again consider a revision, or she may have some catastrophic complications." Plaintiff indicated she might consider surgery during the summer, when she had a break in her school year.

Dr. Bonutti saw Plaintiff again on April 24, 2003. He again discussed the need for revision surgery on her hip due to the loose acetabulum, the worn plastic component and the loss of bone in her socket in the acetabulum. By this point, there was significant osteolysis, which would require a fairly substantial surgery with bone grafting in addition to replacement of the components. During Dr. Bonutti's deposition, the following exchange took place:

> Q. I noted in here a statement that, Patient understands and would like to consider left revision arthroplasty, primarily

>  due to acetabular loosening due to poly wear. So that was something you had explained to her at this time?
>
> A. I explained it to her previously, also; that we felt that the plastic was wearing, causing her socket to loosen, causing bone loss in her acetabulum, and that she should–something should be done. And we had cautioned her to do it earlier.
>
> Q. And you had explained to her that this was not typical or not the expected result of her hip. Correct?
>
> A. That is correct. We suggested to her–again, I can't remember specifics, but this was very rapid and unusual in my clinical practice.

Following repeated warnings by Dr. Bonutti about the loosened acetabular component and the progressive osteolysis from wear of her polyethylene component, Plaintiff finally decided to undergo surgery to replace her loose and worn acetabular component. On June 16, 2003, Plaintiff underwent surgery to replace the acetabular shell, the polyethylene component, and the Zirconia femoral head. Subsequently, on July 17, 2003, Plaintiff asked Dr. Bonutti about the implant and the different materials used. Dr. Bonutti told her that there was fairly rapid wear of her polyethylene and that the ceramic head may have prematurely worn and caused severe polyethylene wear and that she had "advanced or catastrophic failure of the polyethylene ceramic interface." Plaintiff submitted an affidavit, dated November 5, 2006, and stated that she was not aware that her symptoms were wrongfully caused until after her revision surgery on June 16, 2003. She stated that, following the surgery, Dr. Bonutti advised her that her hip implant had "catastrophically failed."

PROCEDURAL HISTORY

Plaintiff filed her original complaint against Stryker on April 14, 2005 in the circuit court of Coles County. On May 24, 2005, Stryker filed a Notice of Removal (#1), and this case was removed to this court based upon diversity jurisdiction. Stryker attached a copy of Plaintiff's original complaint. In the complaint, Plaintiff alleged that Stryker manufactured an artificial hip which replaced Plaintiff's left hip during hip replacement surgery. In Count I, Plaintiff alleged that the artificial hip was defective and unreasonably dangerous and that Stryker was liable based upon products liability. In Count II, Plaintiff alleged that Stryker was liable for negligence. In Count III, Plaintiff alleged that Stryker was liable based upon implied warranty of merchantability. Stryker also attached a copy of its Answer to the complaint, in which it denied that it manufactured or sold the products at issue in this case. Stryker stated that it informed Plaintiff's counsel that the artificial hip components were manufactured and sold by Howmedica.

On August 5, 2005, Plaintiff filed an Amended Complaint (#7). In her Amended Complaint, Plaintiff again alleged that Stryker was the manufacturer of the artificial hip and was liable based upon products liability, negligence and implied warranty of merchantability. In addition, Plaintiff added Howmedica as a Defendant. In Counts IV, V, and VI, Plaintiff alleged that Howmedica manufactured the artificial hip and that Howmedica was liable based upon products liability, negligence and implied warranty of merchantability.[1] Subsequently, on January 19, 2006, Plaintiff filed her Third Amended Complaint (#47) against both Stryker and Howmedica. The allegations of the Third Amended Complaint mirror those of the previously filed Amended Complaint except

---

[1] On January 9, 2006, this court entered an Opinion (#45) which denied Stryker's Motion for Summary Judgment. This court allowed Plaintiff to file an amended complaint and allege that Stryker held itself out as the manufacturer of the product at issue.

that Plaintiff included additional jurisdictional allegations and also included an allegation that Stryker held itself out as the manufacturer of artificial hips like the one implanted in Plaintiff. In her Third Amended Complaint, Plaintiff alleged that the artificial hip implanted in her "was defective and unreasonably dangerous in that the polyethylene and ceramic used in the artificial hip were substandard and defective resulting in the polyethylene and ceramic components deteriorating after being implanted in Plaintiff's hip." Plaintiff alleged that she was required to undergo surgery to remove the defective hip and suffered significant damages, including substantial medical bills, pain and suffering, disability and loss of a normal life.

On October 30, 2006, Defendants filed a Motion for Summary Judgment (#111) claiming that Plaintiff's claims are barred by the applicable statute of limitations. On November 20, 2006, Plaintiff filed a Memorandum of Law in Response to Defendants' Motion for Summary Judgment (#137) and, on December 4, 2006, Defendants filed a Reply (#141). Both sides have also filed numerous documents in support of their arguments.

On February 19, 2007, Defendants filed a Motion for Summary Judgment on Plaintiff's Claims (#170) and a Motion to Exclude Plaintiff's Expert Testimony on Defect and Causation (#172). Defendants argued that Plaintiff cannot establish her product liability claims in this case as a matter of law and that the testimony of Plaintiff's expert witnesses should be excluded based upon Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Defendant Stryker also filed a Renewed Motion for Summary Judgment (#167), arguing that it did not manufacture, design, or sell the products Plaintiff claims caused her injuries, did not control its subsidiary, Osteonics Corporation, now known as Howmedica, and did not hold itself out as the manufacturer of the artificial hip components to the purchasing public when the products in issue were sold in 1994 and

1997. Defendants, however, stated that the briefing on their previous Motion for Summary Judgment established that Plaintiff's complaint was not timely filed. They specifically stated that they were not waiving their statute of limitations defense by filing their Daubert and summary judgment motions. In addition, Plaintiff filed a Motion for Partial Summary Judgment (#169). Plaintiff argued that most of Defendants' defenses included in their Answers to the Third Amended Complaint "are merely superfluous matter contained in the pleadings and must be stricken in order to simplify the issues in this case."

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938 (7th Cir. 2003). However, neither the mere existence of some alleged factual dispute

between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. Michas, 209 F.3d at 692. Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact. See Jordan v. Summers, 205 F.3d 337, 345 (7th Cir. 2000).

## II. STATUTE OF LIMITATIONS

In their Motion for Summary Judgment, Defendants contend that Plaintiff's products liability and negligence claims were not filed within two years of discovery of her injury and that Plaintiff's implied breach of warranty claims were not filed within four years after the goods were delivered to the purchaser. In her response, Plaintiff argues only that her claims were filed within two years of her discovery that her injury was wrongfully caused.[2] Plaintiff does not argue that her implied breach of warranty claims are timely, and this court therefore concludes that Defendants are entitled to summary judgment on those claims. Therefore, the sole remaining issue before this court for decision is whether Plaintiff's products liability and negligence claims were timely filed. Plaintiff's original complaint was filed on April 14, 2005. Therefore, the issue is whether Plaintiff had knowledge prior to April 14, 2003, sufficient to commence the running of the statute of limitations on her product liability and negligence claims against Defendants.

Under Illinois law, which the parties agree applies here, a plaintiff must assert personal injury and products liability claims within two years of the date the cause of action accrued. Gordon v. Ortho-McNeil Pharm., Inc., 430 F. Supp. 2d 814, 816 (N.D. Ill. 2006), citing 735 Ill. Comp. Stat. 5/13-202, 5/13-213(d) (West 2004). To alleviate the harsh effect of this rule, Illinois follows the discovery rule, whereby the statute of limitations is tolled until the plaintiff knows or reasonably

---

[2] In her Response to the Motion for Summary Judgment, Plaintiff has not argued that Defendants did not adequately raise a statute of limitations defense.

should know he has been injured and that his injury was wrongfully caused. Gordon, 430 F. Supp. 2d at 816-17, citing Mele v. Howmedica, Inc., 808 N.E.2d 1026, 1035 (Ill. App. Ct. 2004).[3] The "discovery rule is an equitable device designed to eliminate the unfairness that would result to a plaintiff whose right to bring an action is cut off before she is aware of the existence of such action." Golla v. Gen. Motors Corp., 657 N.E.2d 894, 899 (Ill. 1995).

The question of when a party knew or should have known of both an injury and its wrongful cause is one of fact, unless the facts are undisputed and only one conclusion can be drawn from them. Nolan v. Johns-Manville Asbestos, 421 N.E.2d 864, 868-69 (Ill. 1981); Daubach v. Honda Motor Co., 707 N.E.2d 746, 750 (Ill. App. Ct. 1999). "The phrase 'wrongfully caused' does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." Castello v. Kalis, 816 N.E.2d 782, 789 (Ill. App. Ct. 2004) (emphasis in original); see also Young v. McKiegue, 708 N.E.2d 493, 500 (Ill. App. Ct. 1999); Timbrook v. Concurrent Computer Corp., 1999 WL 759494, at *3 (N.D. Ill. 1999). "'Wrongfully caused' does not mean that the plaintiff must have knowledge of the defendant's negligent conduct before the statute is triggered." Daubach, 707 N.E.2d at 750, citing Knox College v. Celotex Corp., 430 N.E.2d 976, 980 (Ill. 1981). "At some point, the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule, the running of the limitations period commences." Daubach, 707 N.E.2d at 750, citing Knox College, 430 N.E.2d at 980; see also Castello, 816 N.E.2d at 789; Ellis v. Howmedica, Inc., 1999 WL 1068474, at *4 (N.D. Ill. 1999).

---

[3] This court notes that the Illinois Supreme Court recently declined to follow Mele on a different issue. See Calles v. Scripto-Tokai Corp., ___ N.E.2d ___, 2007 WL 4935315 (Ill. Feb. 16, 2007).

Therefore, application of the discovery rule does not "place a premium on being an ostrich, on blinding oneself to the obvious inferences from plain facts." Nelson v. Jain, 526 F. Supp. 1154, 1157 (N.D. Ill. 1981), aff'd 714 F.2d 150 (7th Cir. 1983). Instead, Illinois law focuses on facts reasonably indicating that the known injury was wrongfully caused, "at which point the injured party cannot wait for someone to draw him or her a road map." Nelson, 526 F. Supp. at 1157. "Although an injured person is not held to a standard of knowing the inherently unknowable, he may not slumber on his rights once it appears that the injury was wrongfully caused." Aspegren v. Howmedica, Inc., 472 N.E.2d 822, 824 (Ill. App. Ct. 1985), citing Nolan, 421 N.E.2d at 868.

Defendants argue that, at least by January 2002, Plaintiff knew that her injury was caused by the components of her artificial hip, so that her complaint, filed more than three years later on April 14, 2005, was untimely. Defendants note that it is undisputed that Plaintiff testified that she expected her artificial hip to last for 15 to 20 years. Defendants therefore argue that a reasonable person in Plaintiff's position would have known or should have known that there was something wrong with her artificial hip because she was experiencing loosening and osteolysis which began less than four years after implantation of the artificial hip. In response, Plaintiff contends that she had no reason to suspect that her injury had been wrongfully caused until after the date of her second surgery, June 16, 2003, when she and Dr. Bonutti first learned that the polyethylene did not suffer from normal wear but "advanced or catastrophic failure." Plaintiff argues that June 16, 2003, was the first possible date Plaintiff, or any reasonable person in Plaintiff's circumstances, would have contemplated wrongful causation. She argues that she had no obligation to investigate a possible cause of action until after June 16, 2003, "upon learning of the advanced or catastrophic failure." Based upon the undisputed facts in this case, this court cannot agree with Plaintiff's argument.

In this case, it is undisputed that, in January 2002, Plaintiff was diagnosed with osteolysis, or dead bone, in her hip. Plaintiff testified that, at that time, her understanding of the osteolysis in her hip was that particles of polyethylene from the Osteonics polyethylene liner had gotten between her implant and the bone and had progressively worn the bone away causing the implant to loosen. Plaintiff testified that she also knew on that date that, if the osteolysis continued to progress, the implant "would continue to loosen." It is also undisputed that Dr. Bonutti told her in January 2002 that he thought surgery was "inevitable." Plaintiff's condition continued to worsen during 2002 and Dr. Bonutti continued to recommend surgery, noting on June 11, 2002, that Plaintiff needed to start thinking about surgical options "or it will get worse rapidly." Dr. Bonutti testified that, on December 10, 2002, he "told her she should again consider a revision, or she may have some catastrophic complications." The evidence shows that Plaintiff did not have surgery until June 2003 at least in part because she wanted to schedule the surgery during a break in the school year.

Based upon the evidence, this court agrees with Defendants that Plaintiff knew there was a serious problem at least as of January 2002 and had information that the problem was caused by wear of the polyethylene liner. In addition, Plaintiff was informed in January 2002 that Dr. Bonutti was recommending surgery to correct the problem, telling her that surgery was "inevitable." This occurred approximately four years after her hip replacement surgery, well before the 15 to 20 years she testified she had been told her initial implant would last. This court concludes that the undisputed evidence establishes that, in January 2002, Plaintiff was "possessed of sufficient information" concerning her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct was involved. See Castello, 816 N.E.2d at 789. At that point, under the applicable Illinois case law regarding the discovery rule, the running of the limitations period

commenced. See Daubach, 707 N.E.2d at 750.

In addition, this court notes that the undisputed evidence shows that Plaintiff knew throughout 2002 that Dr. Bonutti was recommending surgery as the only means for correcting the problem she was having with her hip. Plaintiff's decision to delay the recommended surgery for a significant period of time, until June 2003, could not, and did not, delay the commencement of the running of the statute of limitations.

Plaintiff relies on three cases she contends are similar to this one and argues that, based upon this case law, a genuine issue of material fact exists regarding the date the statute of limitations started running in this case. This court concludes that all three cases are distinguishable and do not alter the court's conclusion that, in this case, the statute of limitations began running in January 2002.

In Mele, the plaintiff underwent a total hip replacement on May 28, 1991. The plaintiff complained of pain in the hip at a doctor visit in February 1992. On September 18, 1992, the plaintiff again complained of pain at a follow-up visit, and his doctor suggested removing a component of the hip replacement to alleviate the pain. Mele, 808 N.E.2d at 1030. A second surgery was performed on January 28, 1993, and the plaintiff sued in August 1994. The defendant filed a motion for summary judgment, arguing that the deposition testimony showed that by February 1992, the plaintiff had sufficient notice of wrongful causation to trigger the statute of limitations period. Mele, 808 N.E.2d at 1032. The trial court denied the defendant's motion for summary judgment, finding material issues of fact concerning the time the plaintiff discovered wrongful causation of his injury. Mele, 808 N.E.2d at 1032.

Following a jury trial, the jury awarded the plaintiff $400,000 in itemized damages. Mele,

808 N.E.2d at 1035. On appeal, the defendant argued that judgment should have been entered in its favor because the plaintiff did not file his complaint within two years from the date on which the cause of action accrued. The Illinois appellate court noted that the plaintiff testified that he first learned that his pain might have a wrongful cause in September 1992, when his doctor suggested he might need to remove a component of the implant. Mele, 808 N.E.2d at 1035. The court then concluded that the fact that the plaintiff spoke with an attorney in February 1992 was insufficient to overturn the jury's finding that the plaintiff did not have sufficient notice that wrongful acts may have caused his pain until September 1992. Mele, 808 N.E.2d at 1036. Subsequently, the district court in Gordon stated that the court in Mele "held that the cause of action accrued when the doctor told the plaintiff that removal of the device might be required, rather than when the patient first spoke with the doctor about his post-surgery pain." Gordon, 430 F. Supp. 2d at 817. This court thus concludes that Mele does not support Plaintiff's argument that a genuine issue of material fact exists in this case. It is undisputed that Dr. Bonutti told Plaintiff that surgery was "inevitable" on January 8, 2002.

In Ellis, the evidence showed that the plaintiff had a long history of hip problems and had numerous surgeries to correct the problem. The district court, applying Illinois law, concluded that a question of fact existed as to the date when the plaintiff was "possessed of sufficient information" concerning her injury and its cause to "put a reasonable person on inquiry to determine whether actionable conduct is involved." Ellis, 1999 WL 1068474, at *4. In reaching this conclusion, the district court stated that the plaintiff "had been experiencing hip pain in one form or another for almost 15 years. She had undergone numerous surgical procedures, none of which completely eliminated her pain. Therefore, plaintiff could have reasonably believed, at least at that time, that

the latest procedure was just another in a long line of failures." Ellis, 1999 WL 1068474, at *3. This court agrees with Defendants that the facts of this case are much different. Plaintiff only had one hip surgery, and she completely recovered and enjoyed more than three years of pain-free mobility before she began having pain and was eventually diagnosed with osteolysis in January 2002, which she understood was caused by particles from the polyethylene liner in her hip implant. Unlike the situation in Ellis, Plaintiff was "possessed of sufficient information" at that time to begin the running of the limitations period.

In Aspegren, the plaintiff had a vitallium prosthesis surgically implanted in her hip in 1972. On July 12, 1977, the plaintiff's doctor informed her that the prosthesis was fractured and had to be replaced, and, on September 13, 1977, the fractured prosthesis was removed. The plaintiff filed her complaint on September 4, 1979. The trial court granted summary judgment in favor of the defendant, finding that her cause of action accrued on the date she first became aware that the prosthesis was fractured. Aspegren, 472 N.E.2d at 823-24. On appeal, the Illinois appellate court reversed, finding that a genuine issue of material fact existed as to whether the two-year limitations period began to run on July 12, 1997 or on September 13, 1977. Aspegren, 472 N.E.2d at 824. The court stated that "a fact finder may determine that it was not possible for her to know [at the time the fracture was discovered] whether the injury had been wrongfully caused." Aspegren, 472 N.E.2d at 824. The court stated that the cause of action may have accrued on September 13, 1977, "the date of plaintiff's first opportunity to examine the fractured implant and determine the cause of its failure." Aspegren, 472 N.E.2d at 824.

Based upon Aspegren and Ellis, Plaintiff argues that she did not have sufficient information to suspect wrongful conduct until she was told by Dr. Bonutti, after her surgery, "that the wear on

15

her polyethylene was advanced and catastrophic." This court does not agree. This court has already concluded that this case is distinguishable from Ellis and also concludes that this case is distinguishable from the facts of Aspegren. Here, there is undisputed evidence that Plaintiff was told her implant would last 15 to 20 years, and, after approximately four years, was diagnosed with osteolysis, or dead bone, and was informed that surgery to correct the problem was "inevitable." It is also undisputed that Plaintiff understood the cause of the osteolysis in her hip was that particles of polyethylene from the Osteonics polyethylene liner had gotten between her implant and the bone and had progressively worn the bone away causing the implant to loosen. Unlike the situation in Aspegren, Plaintiff did not need to wait until she had surgery, which did not occur until almost a year and a half later, to start the running of the statute of limitations. As of January 2002, Plaintiff knew or reasonably should have known both of her injury and that it was wrongfully caused. See Castello, 816 N.E.2d at 789. This court concludes that Plaintiff did not need to know there was a "catastrophic" failure before the statute of limitations started to run.

    IT IS THEREFORE ORDERED THAT:

    (1) Defendants' Motion for Summary Judgment (#111) is GRANTED.

    (2) This case is terminated. The Final Pretrial Conference scheduled for June 1, 2007, and the jury trial scheduled for June 18, 2007, are hereby VACATED. The remaining pending Motions (#167, #169, #170, #172) are MOOT.

    ENTERED this 12th day of March, 2007

    **s/ Michael P. McCuskey**
    MICHAEL P. McCUSKEY
    CHIEF U.S. DISTRICT JUDGE